**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **NICHOLAS CURRAULT, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-2542** |
| **AMERICAN RIVER TRANSPORTATION COMPANY, LLC** | **SECTION: D (4)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    INTRODUCTION

This case involves a claim for salvage pursuant to general maritime law and the International Convention on Salvage, 1989 (the "Salvage Convention") arising from a breakaway incident that occurred after Hurricane Ida made landfall in Louisiana on August 29, 2021.  This litigation began in August 2022 when Crescent Ship Service, Inc., its insurers, and Lower River Ship Service, LLC ("Lower River") filed three separate lawsuits for property damage allegedly caused by barges that broke away from American River Transportation Company, LLC's ("ARTCO's") fleet on the Mississippi River after Hurricane Ida made landfall in Louisiana.[1]  The three cases were subsequently consolidated in September 2022 at the request of Crescent Ship Service, Inc.[2]  In July 2023, Captain Nicholas Currault, Troy Currault, André Currault, Captain Sidney Freeman, and Lower River (collectively, the "Salvage Plaintiffs") filed a Verified Marine Salvage Complaint against ARTCO d/b/a ARTCO

---

[1] *See*, Civ. A. No. 22-2874, *Ascot Ins. Co., et al. v. American River Transportation Company, LLC* (E.D. La.) (hereafter, the "*Ascot* matter"); Civ. A. No. 22-2966, *Crescent Ship Service, Inc. v. American River Transportation Co., LLC, et al.* (E.D. La.) (hereafter, the "*Crescent Ship* matter"); Civ. A. No. 22-2979, *Lower River Ship Service, LLC v. American River Transportation Co., LLC, et al.* (E.D. La.) (hereafter, the "*Lower River* matter").

[2] *See*, R. Doc. 10 in the *Crescent Ship* matter and R. Doc. 8 in the *Ascot* matter.

Fleeting Services, *in personam*, and 38 ARTCO barges and their cargo, *in rem*, seeking a marine salvage award for voluntarily and successfully rescuing thirty-eight (38) ARTCO barges from marine peril when the barges broke away from ARTCO's fleet as a result of Hurricane Ida.[3]  At ARTCO's request, the salvage claim was consolidated with the property damage claims in September 2023.[4]

On March 12, 2024, with the assistance of the assigned United States Magistrate Judge, the parties reached a settlement as to the property damage claims.[5]  Thus, the only remaining claim before the Court is the marine salvage claim brought by the Salvage Plaintiffs against ARTCO.[6]  The two issues to be resolved by this Court are straightforward: (1) whether the Salvage Plaintiffs are entitled to a salvage award under general maritime law and, if so, (2) the amount of the salvage award under the Salvage Convention.[7]

This matter was tried before the Court without a jury on April 22, 2024 through April 24, 2024.[8]  The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record in this matter.  Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law.  To the extent that any

---

[3] R. Doc. 1.

[4] R. Docs. 77 & 102 in the *Ascot* matter.

[5] R. Doc. 136 in the *Ascot* matter.

[6] Accordingly, any references to record documents will be references to  Civil Action No. 23-2542, unless specified otherwise.

[7] The Salvage Plaintiffs have agreed to resolve the division of any salvage award, if awarded by the Court, amicably between themselves.  ARTCO raised no objection to the Salvage Plaintiffs' agreement if the Court determines that each Salvage Plaintiff has carried its burden of proof in the trial.  *See*, R. Docs. 24 and 25.

[8] R. Docs. 39, 40, & 41.

finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent any conclusion of law may be construed as a finding of fact, the Court hereby adopts it as such.

## II.   FINDINGS OF FACT

1. At all relevant times, American River Transportation Company, LLC ("ARTCO") owned and operated eleven barge fleeting facilities on both sides of the Lower Mississippi River, from approximately Mile Markers 115 through 118, including Flowers Fleet, Upper Kenner Bend Fleet, Lower Kenner Bend Fleet, Tulane Fleet, and Condo Fleet.[9]  ARTCO also owns "boats" that were not present in its fleet on August 29, 2021.[10]

2. The ARTCO Tulane Fleet is the upper East Bank fleet in the area, while the ARTCO Flowers Fleet is the barge fleet below Tulane Fleet on the East Bank.[11] The ARTCO Upper Kenner Bend Fleet is the upper West Bank fleet in the area, the ARTCO Condo Fleet is located right below the Upper Kenner Bend Fleet on the West Bank, and the Lower Kenner Bend Fleet is located below the Condo Fleet on the West Bank.[12]

3. ARTCO has many assets and entities on the lower Mississippi River, including a stevedoring asset used to move fertilizer and bulk commodities from vessels via crane barges, a wash dock, a fully functional barge facility, repair facility,

---

[9] R. Doc. 24 at p. 15 (Uncontested Material Fact No. 5); Trial Testimony of Capt. Nicholas Currault, Joseph Meerman, and Brent Beockmann.
[10] R. Doc. 35 at p. 6, ¶ 32 & p. 11, ¶ 54; Trial Testimony of Joseph Meerman.
[11] R. Doc. 36 at ¶¶ 11-12; Trial Testimony of Capt. Nicholas Currault.
[12] R. Doc. 36 at ¶¶ 13-15; Trial Testimony of Capt. Nicholas Currault.

and shipyard.[13]  ARTCO also has "a marine side," where it fleets, stores, and operates boats and barges.[14]

4.  The following 23 barges were within the care, custody, and control of ARTCO's fleets at the time Hurricane Ida made landfall in Louisiana on August 29, 2021: CBC 1700, ART 35143, XL 765 Spar Barge, ART 1418 L, GOPV 5L, PB 2228, PB 2230, ART 960B, ART 9012B, ART 24024, ART 35065B, ART 35179, ART 35635, ART 44240, ART 45182, ART 45194, CBC 1352, ART 9028, ART 45101, ART 44350, ART 35276, ART 35534, and ART 44174.[15]

5.  Plaintiff, Lower River, is co-owned by plaintiffs, Capt. Nicholas Currault and his father, Troy Currault.[16]  Lower River owns and operates a vessel fleeting facility at or near mile marker 115 on the East Bank of the Lower Mississippi River, in an area downriver of ARTCO's fleets.[17]  Lower River owns several barges and vessels at the facility including, but not limited to, the M/V SAINT CHARLES and the M/V SHELL FUELER.[18]

6.  Lower River provides various services to the marine industry, including but not limited to salvage, emergency anchor retrieval, most, if not all, marine

---

[13] Trial Testimony of Brent Beockmann.

[14] *Id*.

[15] R. Doc. 24 at p. 15 (Uncontested Material Fact No. 7); Trial Testimony of Joseph Meerman, Artco's Commercial Manager in the Gulf.  In an email sent shortly after Hurricane Ida hit, Meerman identified the last barge in this list as "ART 44194," but he testified at trial that it was the hopper barge, ART 44174, that was one of the breakaway barges that ended up below the Flowers Fleet.  *See*, Trial Testimony of Joseph Meerman; Trial Exhibit 35-0005.  Andrew Minster, an expert in the field of marine surveying and appraisal, also testified that he could not locate "ART 44194" in ARTCO's extensive database, but said that he was able to locate "ART 44174" and he assumed that it was a typographical error.  Trial Testimony of Andrew Minster.

[16] R. Doc. 24 at p. 15 (Uncontested Material Fact No. 3).

[17] R. Doc. 24 at p. 15 (Uncontested Material Fact No. 2); R. Doc. 36 at ¶ 6; Trial Testimony of Capt. Nicholas Currault.

[18] R. Doc. 24 at p. 15, ¶ 2; R. Doc. 36 at ¶ 9.

repair or construction needs, ship dunnage removal, midstream slop removal, and midstream fresh water delivery.[19]

7.  Hurricane Ida made landfall in Louisiana on August 29, 2021.[20]

8.  At the time of Hurricane Ida, plaintiff Nicholas Currault was the captain of the M/V SHELL FUELER and plaintiff André Currault was a deckhand aboard the vessel.[21]  Both were employed by Lower River.[22]  André Currault is the brother of Capt. Nicholas Currault and both Nicholas and André are the sons of Troy Currault.[23]

9.  Captain Nicholas Currault is a licensed captain, tankerman, crane operator, foreman, and engineer who, along with his father, owns and works in the family business, Lower River, and holds Coast Guard licenses as a Master Captain, Tankerman, and Master of Towing.[24]

10. André Currault worked for Marquette Transportation as a deckhand from 2018 to 2020, and testified that he has worked with his father, Troy, and brother, Nicholas, at Lower River for about two years.[25]

11. Troy Currault testified that he has been working on the Mississippi River since 1982.[26]

---

[19] R. Doc. 36 at ¶ 6.
[20] R. Doc. 24 at p. 15 (Uncontested Material Fact No. 1).
[21] Trial Testimony of Capt. Nicholas Currault.
[22] R. Doc. 35 at p. 7, ¶ 36; R. Doc. 36 at p. 5, ¶¶ 3-4; Trial Testimony of Capt. Nicholas Currault; Trial Exhibit 146.
[23] R. Doc. 35 at p. 7, ¶ 36; Trial Testimony of Capt. Nicholas Currault and Troy Currault.
[24] Trial Testimony of Capt. Nicholas Currault.
[25] Deposition and Trial Testimony of André Currault, Trial Exhibit 146.
[26] Trial Testimony of Troy Currault.

12. Plaintiff, Captain Sidney Freeman, who holds a 100-ton Master Captain's Coast Guard license, is a dispatcher for Port Ship Service, Inc. ("Port Ship").[27]

13. When Hurricane Ida hit Louisiana on August 29, 2021, ARTCO had over 900 vessels in the lower Mississippi River, and over 500 barges in ARTCO's fleets were located above Lower River's fleet facility.[28]

14. During Hurricane Ida, Capt. Nicholas Currault, André Currault, and Capt. Sidney Freeman were aboard the M/V SHELL FUELER.  Capt. Nicholas Currault and André Currault were monitoring the Lower River fleet,[29] while Capt. Freeman was monitoring the Port Ship crew boats that were moored to the Port Ship dock.  Troy Currault was aboard the M/V SAINT CHARLES during this time, also monitoring the Lower River fleet. [30]  Troy Currault and the M/V SAINT CHARLES were stationed approximately 180 feet downriver from Capt. Nicholas Currault and the M/V SHELL FUELER.[31]

15. The Curraults stayed with their vessels during the hurricane to tend to their moorings and to make any necessary adjustments during the weather event.[32]

16. There were no ARTCO personnel within ARTCO's fleets during the storm.[33] ARTCO contracted with third parties to provide fleet boats during the storm,

---

[27] R. Doc. 35 at p. 7, ¶ 36; R. Doc. 36 at p. 5, ¶ 5; Trial Testimony of Capt. Sidney Freeman.
[28] Trial Testimony of Joseph Meerman and Capt. Nicholas Currault.
[29] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman.
[30] Trial Testimony of Troy Currault, Capt. Nicholas Currault, and Capt. Sidney Freeman.
[31] Trial Testimony of Capt. Nicholas Currault and Troy Currault; Trial Exhibit 2A.
[32] Trial Exhibit 146 at p. 15, André Currault Deposition Designations; Trial Testimony of Capt. Nicholas Currault and Troy Currault.
[33] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Joseph Meerman.

but none of those fleet boats were willing to provide fleeting services until daybreak on August 30, 2021.[34]

17. Sometime in the evening of August 29, 2021, after Hurricane Ida made landfall in Louisiana, several barges that were in ARTCO's fleet broke away and began to make their way downriver toward the Lower River facility.[35]  The following 23 barges, which were in the care, custody and control of ARTCO's fleets, broke away: CBC 1700, ART 35143, XL 765 Spar Barge, ART 1418 L, GOPV 5L, PB 2228, PB 2230, ART 960B, ART 9012B, ART 24024, ART 35065B, ART 35179, ART35635, ART 44240, ART 45182, ART 45194, CBC 1352, ART 9028, ART 45101, ART 44350, ART 35276, ART 35534, and ART 44174.[36]

18. Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman first became aware of the breakaway barges at around 10 p.m. on August 29, 2021, when the M/V SHELL FUELER was struck on its stern by a loaded ARTCO barge that was floating downriver.[37]  The impact broke both of the face wires on the M/V SHELL FUELER, as well as a head line, and caused the M/V SHELL FUELER to slam into the dock, which broke the rudders and killed one of the two generators that provided power to the boat.[38]  That impact also caused interior damage to the M/V SHELL FUELER, including causing the

---

[34] Trial Testimony of Joseph Meerman, Kenny Billiot, Sr., and Kenny Billiot, Jr.
[35] R. Doc. 35 at ¶ 41.
[36] R. Doc. 24 at p. 15 (Uncontested Material Fact No. 7); Trial Testimony of Joseph Meerman.
[37] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman.
[38] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman; Trial Exhibit 146 at pp. 11-13.

refrigerator that was mounted to the wall to break off and causing the wheelhouse and galley to be "trashed."[39]

19. After recovering from the impact of the ARTCO barge, Capt. Nicholas Currault looked upriver and saw more breakaway barges heading in his direction.[40]

20. About an hour later, at approximately 11:18 p.m., another loaded breakaway barge, ART 45194, a "loaded hopper" or regulated dry cargo barge, struck the M/V SAINT CHARLES and got stuck underneath it for about 15 to 20 minutes, causing damage to the bottom of the boat, before going behind a nearby ferry.[41]

21. Approximately 15 minutes later, three ARTCO breakaway barges – an empty barge and two loaded barges – approached the Lower River dock. Capt. Nicholas Currault used the M/V SHELL FUELER's wheel wash to push the barges away from the M/V SHELL FUELER in order to prevent the breakaway barges from colliding with the barges in the Lower River fleet.[42]

22. Capt. Nicholas Currault, André Currault, and Capt. Sidney Freeman continued to use the M/V SHELL FUELER's wheel wash to slow down the 23 ARTCO breakaway barges and to push or "beach them" in the mud on the bank of the Mississippi River, below or past Lower River's property.[43]

23. Capt. Nicholas Currault, Troy Currault, Capt. Sidney Freeman, and André Currault described Capt. Nicholas Currault's actions as "catching" the

---

[39] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman; Trial Exhibit 146 at pp. 11-13.
[40] Trial Testimony of Capt. Nicholas Currault.
[41] *Id.*; Trial Exhibits 2 and 2A.
[42] Trial Testimony of Capt. Nicholas Currault and Troy Currault.
[43] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman; Trial Exhibits 3, 1-0005, & 5.

breakaway barges and running them aground to create "dams," or holding places, that acted as anchors to hold the breakaway barges in place on the beach.[44]

24. Some of the breakaway barges that Capt. Nicholas Currault and his crew saved during this time period were actively sinking or at serious risk of sinking, including the ART 35143, the GOPV 5B, and the ART 24024.[45]

25. Capt. Nicholas Currault and his crew aboard the M/V SHELL FUELER continued to beach the ARTCO breakaway barges for about seven hours, from approximately 11:00 p.m. on August 29, 2021 until 6:00 a.m. on August 30, 2021.[46]

26. Throughout the night and into the morning hours, Capt. Nicholas Currault and his crew aboard the M/V SHELL FUELER caught and beached many ARTCO breakaway barges, including the 23 barges that the parties agree were in the care, custody, and control of ARTCO's fleets at the time Hurricane Ida hit.[47]  Sometime after daybreak, the number of breakaway barges floating downriver slowed down and Capt. Nicholas Currault and his crew aboard the M/V SHELL FUELER began using mooring lines to secure ARTCO barges at Lower River's dock.[48]

---

[44] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman; Trial Exhibit 146 at pp. 20-21; Trial Exhibit 5.

[45] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman; Trial Exhs. 24-0001-24-0007 & 26-0001-26-0007.

[46] Trial Testimony of Capt. Nicholas Currault and Troy Currault; Trial Exhibit 5.

[47] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Joseph Meerman; R. Doc. 24 at p. 15 (Uncontested Material Fact No. 7); Trial Exhibit 8.

[48] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman; Trial Exhibits 9, 11, 15, 16, 17, 18, & 146 at p. 26.

27. Troy Currault remained on the M/V SAINT CHARLES throughout the evening, assisting the salvage operation throughout the evening by watching for breakaway barges, radioing the M/V SHELL FUELER and being the "coach" of the salvage operation.[49]  It was Troy Currault's suggestion that the crew of the M/V SHELL FUELER push the breakaway barges onto the bank and make them "stick there."[50]

28. During the salvage operation, Capt. Sidney Freeman acted as lookout aboard the M/V SHELL FUELER in the wheelhouse and out on the deck and advised of oncoming breakaway barges throughout the evening.[51]  Capt. Freeman testified that the best way he could explain what he was feeling was to "stick your hand out the window on the interstate that's what it felt like on the deck the whole time being stung by rain the whole time."[52]  Capt. Freeman testified that his role during the evening was to make certain that there were no wires or rope hanging off the barges that could get entangled with their vessel, the M/V SHELL FUELER, which would cause them to be "dead in the water, we could die, we could flip [if] we're stuck to the barges, flips us over.  We go where the barge goes."[53]  Capt. Freeman also testified that he assisted in mooring ARTCO's barges in front of the dock at Lower River and Port Ship Service that came loose later that morning.[54]

---

[49] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman.
[50] *Id.*
[51] *Id.*
[52] Trial Testimony of Capt. Sidney Freeman.
[53] *Id.*
[54] *Id.*

29. André Currault testified that he was tending to the lines and the vessel during the entire evening until daylight while the crew was "collecting or catching" the ARTCO breakaway barges.[55]  His testimony further corroborates that ARTCO barges struck both the M/V SHELL FUELER and the M/V SAINT CHARLES.[56]

30. The Court found Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman extremely credible in their demeanor and their testimony, and further found that each witness's testimony was supported by extrinsic evidence.  Troy Currault's sincerity was particularly credible when he emotionally testified that he was afraid on that evening of "the conditions, my sons getting hurt, Sidney getting hurt, possibly dying," and further when he testified that he helped direct the salvage operation because "He was a mariner.  A mariner does correct for everyone whether it's his barge, a ship's barge, it does not matter.  Everybody is the same level.  Your equipment is their equipment its all the same.  Try to save it."[57]

31. The trial testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman is corroborated by ARTCO's contract employees, Captains Kenny Billiot, Sr. and Kenny Billiot, Jr., who both testified that they saw at least one ARTCO breakaway barge and that neither took steps to attempt retrieval because of safety concerns.[58]  Both witnesses further testified that

---

[55] *Id.*
[56] *Id.*
[57] Trial Testimony of Troy Currault.
[58] Trial Testimony of Capt. Kenny Billiot, Sr. and Capt. Kenny Billiot, Jr.

they received at least one call that evening advising of an ARTCO barge on a neighbor's dock and asking for assistance.[59]  The Court found Captains Kenny Billiot, Sr. and Kenny Billiot, Jr. credible in their demeanor and their testimony.

32. ARTCO's commercial manager for the Gulf of Mexico, Joseph Meerman, also confirmed that Capt. Kenny Billiot, Sr. had called him the evening of August 29, 2021 to advise that he had seen a barge that had broken free during the storm.[60]

33. The trial testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman is further corroborated by Captain Frederick "Bubba" Willhoft, III, the lead captain and managing partner of Crescent Ship Service, Inc. ("Crescent Ship").  Capt. Willhoft testified that he has been a captain for over 30 years on the Mississippi River and that Crescent Ship's property "butts up right next to" Lower River's facility.[61]  Capt. Willhoft further stated that Capt. Nicholas Currault and Troy Currault have been his competitors for several years, but that they have gotten to know each other and have become friends over the years.[62]  Capt. Willhoft further testified that when Hurricane Ida hit, he and his crew secured their fleet and intended to ride out the storm until the fleet was hit by some breakaway barges, which he believes came from

---

[59] *Id.*
[60] Trial Testimony of Joseph Meerman.
[61] Trial Testimony of Capt. Willhoft.
[62] *Id.*

ARTCO's fleet.[63]  At that point, Capt. Willhoft assessed the damages and told his crew to get off the Crescent Ship barge, so they rode out the storm in their vehicles in the parking lot of Crescent Ship.[64]  After a few hours, somewhere around two or three in the morning, Capt. Willhoft left Crescent Ship and went next door to check on everyone at Lower River, Port Ship, and Belle Chasse Marine.[65]  Capt. Willhoft went to Lower River's office first, where he saw the crew from the M/V HIAWATHA, which had abandoned their vessel in the Mississippi River.[66]  They told him that Troy Currault and Capt. Nicholas Currault were still out on their boats, the M/V SAINT CHARLES and the M/V SHELL FUELER.[67]  Capt. Willhoft testified that he saw Capt. Nicholas Currault on the M/V SHELL FUELER "catch" two barges from the middle of the river and push them aground, and that he saw additional barges on the left descending bank of the river.[68]  Capt. Willhoft also testified that the wind was blowing pretty hard at this point, and estimated that it was in the 40 to 50 mile per hour range.[69]  Capt. Willhoft described the weather conditions as "hectic" for a towboat captain moving barges in the Mississippi River, and said that the wind speeds made it a dangerous situation.[70]  The Court found Capt. Willhoft credible in his demeanor and his testimony.

---

[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] Trial Testimony of Capt. Willhoft and Troy Currault.
[67] Trial Testimony of Capt. Willhoft.
[68] *Id.*
[69] *Id.*
[70] *Id.*

34. Andrew Minster, who was qualified by the Court as an expert in the field of marine surveying and appraisal, without objection from ARTCO, testified at trial that the 23 ARTCO breakaway barges had the following fair market value on August 29, 2021:

   1) The fair market value of the **GOPV 5,** a loaded, boxed, hopper barge measuring 200 feet long by 35 feet wide, was $280,000.00;

   2) The fair market value of the **XL 765,** an empty, raked, boxed, spar, hopper barge measuring 200 feet long by 35 feet wide, was $100,000.00;

   3) The fair market value of the **ART 1418,** a loaded, boxed, hopper barge measuring 200 feet long by 35 feet wide, was $308,000.00;

   4) The fair market value of the **ART 24024,** an empty, boxed, hopper barge measuring 200 feet long by 35 feet wide, was $250,000.00;

   5) The fair market value of the **ART 35065,** an empty, boxed, hopper barge measuring 200 feet long by 35 feet wide, was $672,000.00;

   6) The fair market value of the **ART 35143,** a loaded, raked, hopper barge measuring 195 feet long by 35 feet wide, was $640,000.00;

   7) The fair market value of the **ART 35179,** an empty raked hopper barge measuring 195 feet long by 35 feet wide, was $670,000.00;

   8) The fair market value of the **ART 35635,** an empty, boxed, hopper barge measuring 200 feet long by 35 feet wide, was $766,500.00;

9) The fair market value of the **ART 44240,** an empty, boxed, hopper barge measuring 200 feet long by 35 feet wide, was $836,000.00;

10) The fair market value of the **ART 44350,** a loaded, raked, hopper barge measuring 195 feet by 35 feet, was $850,000.00;

11) The fair market value of the **ART 45101,** a loaded, raked, hopper barge measuring 200 feet long by 35 feet wide, was $770,000.00;

12) The fair market value of the **ART 45182,** a loaded, raked, hopper barge measuring 200 feet long by 35 feet wide, was $935,000.00;

13) The fair market value of the **ART 45194,** an empty, raked, hopper barge measuring 200 feet long by 35 feet wide, was $1,034,000.00;

14) The fair market value of the **PB 2228,** an empty, raked hopper barge measuring 195 feet long by 35 feet wide, was $408,500.00;

15) The fair market value of the **PB 2230,** an empty, boxed, hopper barge measuring 200 feet long by 35 feet wide, was $430,000.00;

16) The fair market value of the **ART 35276,** an empty, boxed, hopper barge measuring 200 feet long by 35 wide, was $703,000.00;

17) The fair market value of the **ART 35534,** an empty, raked, hopper barge measuring 195 feet long by 35 feet wide, was $700,000.00;

18) The fair market value of the **CBC 1352,** an empty tank barge measuring 200 feet long by 35 feet wide, was $1,679,000.00;

19) The fair market value of the **CBC 1700,** an empty raked tank barge measuring 200 feet long by 54 feet wide, is $2,538,000.00.;

20) The fair market value of the **ART 9012B,** an empty, boxed, tank barge measuring 200 feet long by 35 feet wide was $1,610,000.00;

21) The fair market value of the **ART 9028,** an empty, boxed, tank barge measuring 200 feet long by 35 feet wide, was $1,610,000.00;

22) The fair market value of the **ART 960B,** an empty, boxed, tank barge measuring 200 feet long by 35 feet wide, was $437,000.00; and

23) The fair market value of the **ART 44174** was $580,000.00.[71]

35. At trial, the parties stipulated that ARTCO's expert on valuation, Kyle Smith, arrived at a valuation opinion on the 23 ARTCO breakaway barges using the same valuation methodology as Andrew Minster.[72]

36. The Salvage Plaintiffs had no legal or contractual duty or obligation to ARTCO with respect to the barges that broke out of ARTCO's fleet.[73]

## III.   CONCLUSIONS OF LAW

## A. Applicable Law

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, general maritime law, and the International Convention on Salvage, 1989 (the "Salvage Convention").[74]

---

[71] Trial Testimony of Andrew Minster; R. Doc. 24 at pp. 16-17 (Uncontested Material Fact Nos. 8-29).
[72] *See,* R. Doc. 41.  As a result of the stipulation, the parties agreed that ARTCO would not call Kyle Smith to testify at trial.
[73] R. Doc. 24 at p. 18 (Uncontested Material Fact No. 30).
[74] International Convention on Salvage, April 28, 1989, S. Treaty Doc. No. 102-12, 1953 U.N.T.S. 193 (hereafter, "Salvage Convention").

2. The Court has determined that, to the extent there is any conflict between general maritime law principles and the Salvage Convention, the Salvage Convention will determine the outcome.[75]

3. The Court finds that the Salvage Plaintiffs have standing to bring a salvage claim. Troy Currault, André Currault, Capt. Nicholas Currault, and Sidney Freeman have standing because they participated in the salvage operation.[76] Lower River has standing because, "A salving owner is granted a salvage reward because of the risk and danger to which his property is exposed."[77] ARTCO does not contest that the Salvage Plaintiffs have standing to bring a salvage claim.[78]

## B. The Salvage Plaintiffs Are Entitled to a Salvage Award

4. "Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril or the sea . . . . Success is essential to the claim; . . . ."[79]

5. "Marine salvage is as old and hoary a doctrine as may be found in the Anglo—American law. Since time immemorial, the mariner who acted voluntarily to save property from peril on the high seas has been entitled to a reward. This

---

[75] R. Doc. 38 at pp. 1-3.
[76] *Sunglory Maritime Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 641 (E.D. La. 2016) (quoting *Saint Paul Marine Transp. Corp. v. Cerro Sales Corp.*, 505 F.2d 1115, 1117 (9th Cir. 1974)) (quotation marks omitted).
[77] *Sunglory*, 212 F. Supp. 3d at 639, n.148 (citing *The Blackwall*, 77 U.S. 1, 13, 19 L.Ed. 870 (1869)).
[78] *See*, R. Doc. 35 at pp. 22-32.
[79] *The Blackwall*, 77 U.S. 1, 12, 19 L.Ed. 870 (1869).

simple rule has been an integral part of maritime commerce in the western world since the western world was civilized."[80]

6.  "The doctrine of salvage is settled. 'A successful salvage claim requires three proofs: (1) marine peril; (2) voluntary service rendered when not required as an existing duty or from a special contract; and (3) success in whole or in part or contribution to the success of the operation."[81]

7.  "When salvage claims are asserted, the salvor bears the burden of persuasion regarding salvage value."[82]

8.  Under the Salvage Convention, a "[s]alvage operation means any act or activity undertaken to assist a vessel or any other property in danger in navigable waters or in any other waters whatsoever."[83]

9.  "The Salvage Convention does not appear to have eliminated the general maritime law's requirement that, to succeed on a salvage claim, a plaintiff must prove three elements: (1) that the property faced a marine peril; (2) that voluntary service was rendered when not required as an existing duty or from a special contract; and (3) the salvage attempt succeeded in whole or in part, or contributed to the success of the operation."[84]

---

[80] *Margate Shipping Co. v. JA Orgeron*, 143 F.3d 976, 985 (5th Cir. 1998) (footnote omitted).
[81] *U.S. v. EX-USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002), *rev'd* 297 F.3d 378 (5th Cir. 2002).
[82] *Allseas Maritime, S.A. v. M/V Mimosa*, 812 F.2d 243, 249 (5th Cir. 1987) (citation omitted); R. Doc. 35 at ¶ 70.
[83] Salvage Convention, art. 1.  *See,* R. Doc. 35 at ¶ 63; R. Doc. 36 at p. 42, ¶ 13.
[84] *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 837-38 (E.D. La. 2016) (citing *EX-USS CABOT/DEDALO*, 297 F.3d at 381).  *See,* R. Doc. 35 at ¶ 63; R. Doc. 36 at p. 42, ¶ 13.

10. To satisfy the marine peril element, the property must be "in danger." While the property need not be in imminent or absolute danger, "The property must be in danger, either presently or reasonably to be apprehended" if the salvage services are not rendered.[85]  "Courts may consider the degree of peril when determining the amount of the salvage award, but not in assessing whether a salvage award is warranted."[86] "Without any danger, however, services cannot be called marine salvage."[87]  The party seeking a salvage award bears the burden of proving that the property faced a marine peril.[88]

11. To satisfy the voluntariness element, the services must be performed "voluntarily, while under no legal obligation or compulsion to do so."[89]  Indeed, "even services that are rendered by accident may be considered 'voluntary' for purposes of a salvage claim."[90]  Nonetheless, "A salvor obviously will not receive an award if he loses the property or acts in bad faith."[91]  The Salvage Convention echoes the voluntariness element in Articles 6(1) and 17.  Article 6(1) provides that, "This Convention shall apply to any salvage operations save to the extent that a contract otherwise provides expressly or by implication."[92]

---

[85] *Sunglory,* 212 F. Supp. 3d at 647-48 (citing authority). R. Doc. 35 at ¶ 63(a); R. Doc. 36 at p. 43, ¶ 16.

[86] *Sunglory*, 212 F. Supp. 3d at 647 (*citing* 3A *Benedict on Admiralty* § 63).

[87] *Sunglory*, 212 F. Supp. 3d at 648 (citing *M/V ANDREW J. BARBERI*, 534 F. Supp. 2d 370, 377 (E.D.N.Y. 2008)).

[88] *Sunglory*, 212 F. Supp. 3d at 647 (*citing* Salvage Convention, art. 1(a)).  R. Doc. 35 at ¶ 63(a); R. Doc. 36 at pp. 43-44, ¶ 16.

[89] *Sunglory*, 212 F. Supp. 3d at 650 & 651 (citing *EX-USS CABOT/DEDALO*, 297 F.3d at 381; 3A *Benedict on Admiralty* § 68); R. Doc. 35 at ¶ 63(b); R. Doc. 36 at p. 44, ¶ 18.

[90] *Sunglory*, 212 F. Supp. 3d at 651 (citing *B.V. Bureau Wijsmuller v. U.S.*, 702 F.2d 333, 339 (2d Cir. 1983)) ("Whatever motive impels the true volunteer, be it monetary gain, humanitarian purposes or merely error, it will not detract from the status accorded him by law.").

[91] *Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 675-76 (5th Cir. 2000).

[92] Salvage Convention, art. 6(1).

Article 17 similarly provides that, "No payment is due under the provisions of this Convention unless the services rendered exceed what can be reasonably considered as due performance of a contract entered into before the danger arose."[93]

12. To satisfy the third element, success in whole or in part, "[w]hile the distressed vessel must be saved . . . it is unnecessary that it be saved solely by the one seeking the salvage award."[94]  Thus, while "the rule in salvage cases has always been that only success is rewarded," a claimant "need only render some beneficial service to the distressed vessel that contributed to its relief from danger."[95]

13. The Court finds that the Salvage Plaintiffs, individually and jointly, have sustained their burden of proving that ARTCO's 23 breakaway barges faced a marine peril, since at the time of the salvage efforts, the barges were in danger, either "presently or reasonably to be apprehended," of causing significant injury or damage to themselves and other vessels or facilities as they floated downstream and away from ARTCO's fleet.  The Court bases this finding in great part on the testimony of Capt. Nicholas Currault, Troy Currault, Capt. Sidney Freeman, Captain Kenny Billiot, Sr., Captain Kenny Billiot, Jr., and Capt. Willhoft, and the Court's determination that their testimony was both credible and supported by the evidence.  That finding is further supported by

---

[93] Salvage Convention, art. 17.
[94] *In re Iowa Fleeting Service, Inc.*, 211 F. Supp. 2d 794, 798 (M.D. La. 2002) (citing *West Coast Shipping Brokers Corp., M/V "Cebu I" v. Ferry "CHUCHEQUERO,"* 582 F.2d 959, 960 (5th Cir. 1978)).
[95] *Iowa Fleeting*, 211 F. Supp. 2d at 798 (citing *West Coast Shipping*, 582 F.2d at 960).

the actual damage to the M/V SHELL FUELER when it was first struck by one of ARTCO's breakaway barges.[96]   Additionally, ARTCO's representative, Joseph Meerman, testified that he was made aware by a call from Capt. Kenny Billiot, Sr. on the evening of August 29th that at least one of ARTCO's barges had broken away.[97]   Meerman testified that, "a breakaway barge could potentially cause problems for any facility."[98]   Meerman further testified that ARTCO settled claims for damage caused by its breakaway barges during Hurricane Ida with Crescent Ship Services, which supports a finding of marine peril.[99]   To the extent ARTCO claims that the weather conditions at the time of the salvage operation were mild,[100] the Court rejects this argument as unsupported by the evidence.  Further, ARTCO's argument flies in the face of its own actions.  Joseph Meerman, ARTCO's commercial manager in the Gulf of Mexico, testified that ARTCO ordered its crew off of its fleet due to the impending weather conditions caused by Hurricane Ida.[101]

14. The Court likewise finds that each Salvage Plaintiff, individually, has carried his burden of proving that he rendered voluntary service in salvaging the breakaway barges.  The parties agree that there was no legal or contractual duty or obligation between the Salvage Plaintiffs and ARTCO with respect to the barges that broke out of ARTCO's fleets.[102]  Thus, it is undisputed that this

---

[96] The damage to the M/V SHELL FUELER was described in Finding of Fact No. 15 herein.
[97] Trial Testimony of Joseph Meerman.
[98] *Id.*
[99] *Id.*
[100] R. Doc. 35 at ¶ 67.
[101] Trial Testimony of Joseph Meerman.
[102] R. Doc. 24 at p. 18, ¶ 30 (Uncontested Material Fact No. 30).

element is met.  To the extent ARTCO argues the Salvage Plaintiffs were simply trying to protect their own property, the evidence adduced at trial undercuts that argument.  The Court credits the testimony of Capt. Nicholas Currault, Troy Currault, Capt. Sidney Freeman, and Capt. Willhoft, who testified that the Salvage Plaintiffs slowed, caught, and beached ARTCO's breakaway barges below Lower River's facility—after the barges no longer posed a threat to Lower River's facility.[103]  The photographic evidence from that evening also supports this testimony, as it shows ARTCO's barges beached below Lower River's facility.[104]  Capt. Willhoft's testimony corroborated both the testimony of the Curraults and the photographic evidence, as he testified that when he saw Capt. Nicholas Currault catch and beach two ARTCO breakaway barges, the barges were not heading toward Lower River's property.[105]  To the extent that ARTCO has argued that a finding of intent is necessary in order for a court to make a finding of salvage,[106] which argument the Court does not find supported by the law, the Court finds these witnesses' testimony and the trial evidence supports a finding that the Salvage Plaintiffs' intent went beyond protection of Lower River's property and included an intent to save non-Lower River property as well.[107]  The Court found these witnesses' testimony particularly credible on the issue of whether the Salvage Plaintiffs'

---

[103] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman.
[104] Trial Exhibit 5.
[105] Trial Testimony of Capt. Willhoft.
[106] R. Doc. 35 at pp. 13-18.
[107] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman.

actions were voluntary and whether the Salvage Plaintiffs' intent went beyond protecting their own property.

15. Finally, the Court finds that the Salvage Plaintiffs, individually and jointly, have shown that they were successful in slowing, catching, and beaching/mooring 23 of the barges that broke away from ARTCO's fleet. Their actions together, and each plaintiff's individual actions, were successful because the Salvage Plaintiffs prevented the breakaway barges from capsizing, sinking, damaging themselves, and damaging neighboring property. The Court relies on the testimony of Capt. Nicholas Currault and Troy Currault to support this finding, testimony which the Court finds corroborated by the testimony of Capt. Kenny Billiot, Sr., Capt. Kenny Billiot, Jr., and Capt. Willhoft.

16. The Court rejects ARTCO's argument that the salvage operation was not a success since some of ARTCO's barges capsized or sank.[108]

17. As set forth above, the Court finds that each Salvage Plaintiff has satisfied his burden of proving all three elements of a salvage claim and, therefore, each Salvage Plaintiff, individually, is entitled to a salvage award.[109]

---

[108] R. Doc. 35 at ¶¶ 65-66.

[109] The Salvage Plaintiffs have agreed to resolve the division of any salvage award, if awarded by the Court, amicably between themselves. ARTCO raised no objection to the Salvage Plaintiffs' agreement if the Court determines that each Salvage Plaintiff has carried its burden of proof in the trial. *See*, R. Docs. 24 and 25.

## C. The Salvage Convention Factors

18. "'A salvage award is decreed in a court of admiralty not in the way of mere *quantum meruit* for work and labor performed, but as a bounty given on grounds of public policy, to ensure safety of property and life at sea; to promote commerce and trade; to save and restore property to its owners; to induce and encourage others to risk life and limb, if need be, in the interest of saving distressed property; and to eliminate any temptation on the part of the rescuers to despoil the saved property.'  Accordingly, the public policy of salvage awards is to overcome any unwillingness on the part of salvors to assume additional labor and risks in the interest of saving life and property on navigable waters.  Thus, all who render beneficial aid  and who are not legally barred should be entitled to a salvage reward."[110]

19. "The appropriate salvage award in a particular case is highly circumstantial and generally 'should not be based upon fixed percentages of the value of the salved property or upon comparisons to percentages from previous awards.'"[111]  "In fixing the amount of a salvage award, the Court, in its sound discretion, must take into consideration all of the facts and circumstances of the salvage operation, weigh and consider them, stress some and discount others, and ultimately arrive at a final figure."[112]  "The case law stresses that the Court's

---

[110] *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 651 (E.D. La. 2016) (*quoting* 3A *Benedict on Admiralty* § 232 & citing *Lancaster v. Smith*, 330 F. Supp. 65 (S.D. Ala. 1971); *The Missouri*, 17 F. Cas. 484 (D. Mass. 1854); *The Rio Grande*, 22 F. 914 (S.D.N.Y. 1885); *The Arizonan*, 144 F. 81 (2d Cir. 1906)).
[111] *Sunglory*, 212 F. Supp. 3d at 652 n.252 (citing *Jones v. Sea Tow Servs. Freeport N.Y. Inc.*, 30 F.3d 360, 364 (2d Cir. 1994)).
[112] *Sunglory*, 212 F. Supp. 3d at 652.

analysis is an equitable one, meant to consider the unique facts and circumstances of each case and avoid rigid yardsticks, overreliance on precedent, which is rarely if ever on all-fours with the facts of a particular case, or rote application of rule-of-thumb percentages of the value of salved property."[113]

20. Under general maritime law, courts have long utilized a six-factor test laid out by the Supreme Court in *The Blackwall*[114] to determine the amount of a salvage award, wherein courts consider:

> 1. the labor expended by the salvors in rendering the salvage service;
> 2. the promptitude, skill, and energy displayed in rendering the service and saving the property;
> 3. the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed;
> 4. the risk incurred by the salvors in securing the property from the impending peril;
> 5. the value of the property saved; and
> 6. the degree of danger from which the property was rescued.

21. In evaluating the *Blackwall* factors, the Fifth Circuit has advised courts "to use the first, second, third, fourth, and sixth factor to arrive at a percentage to be applied to the fifth factor, salved value, for purposes of establishing the award."[115]  The Fifth Circuit further held that, "In setting the percentage, some care should of course be taken to stay within the bounds of historical practice, . . . and to account for all of the relevant circumstances of the specific salvage at issue.  The predominant consideration, however, should always be to arrive

---

[113] *Id.* (citing authority).
[114] 77 U.S. 1, 19 L.Ed. 870 (1869).
[115] *Margate Shipping Co. v. M/V JA Orgeron,* 143 F.3d 976, 989 (5th Cir. 1998).  *See*, *Sunglory*, 212 F. Supp. 3d at 652 (citing *Margate*, 143 F.3d at 989).

at an award that reasonably reflects the price upon which the parties would have agreed."[116]

22. The Fifth Circuit has held that, "the law must provide for a proper and reasonable salvage award, one that gives neither the salvor too little incentive to do the salvage properly, nor the salvee too little reason to care if his property is saved."[117]   The court went on to say, "By far the most important of these considerations, however, will be the cost to potential salvors of performing the service and the benefit to the salvee of it being performed . . . ."[118]

23. The Salvage Convention states that,

The reward shall be fixed with a view to encouraging salvage operations, taking into account the following criteria without regard to the order in which they are presented below:

1. The salved value of the vessel or other property;
2. The skill and efforts of the salvors in preventing or minimizing damage to the environment;
3. The measure of success obtained by the salvor;
4. The nature and degree of the danger;
5. The skill and efforts of the salvors in salving the vessel, other property and life;
6. The time used and expenses and losses incurred by the salvors;
7. The risk of liability and other risks run by the salvors or their equipment;
8. The promptness of the services rendered;
9. The availability and use of vessels or other equipment intended for salvage operations;
10. The state of readiness and efficiency of the salvor's equipment and the value thereof.[119]

---

[116] *Margate,* 143 F.3d at 989.  *See, Sunglory,* 212 F. Supp. 3d at 652 (citing *Margate,* 143 F.3d at 989).
[117] *Margate,* 143 F.3d at 986 (citation omitted).
[118] *Id.*
[119] Salvage Convention, art. 13(1).

24. The Salvage Convention further specifies that, "The rewards, exclusive of any interest and recoverable legal costs that may be payable thereon, shall not exceed the salved value of the vessel and other property."[120]

25. "At least two district courts that have considered salvage claims pursuant to the Salvage Convention have concluded that the 'six *Blackwall* factors were essentially adopted, although not in identical language, by the 1989 Salvage Convention.'"[121]

26. The Court recognizes, and the parties have agreed, that if the Salvage Plaintiffs are unable to prove at trial that they helped prevent or minimize damage to the environment, as required under the Salvage Convention, the outcome of the case will be the same as if general maritime law had applied.[122]

27. Regarding the first Salvage Convention factor, the salved value of the vessel or property, the Fifth Circuit has held that, "Generally, the value of property for salvage purposes is its market value as salved."[123]  The Fifth Circuit further held that when there is no market for the salved property, the most appropriate measure of value may be the "replacement cost."[124]  Here, the evidence adduced at trial, through the Salvage Plaintiffs' expert surveyor, Andrew Minster, is that the 23 barges that broke away from ARTCO's fleet and were salvaged by the Salvage Plaintiffs had a fair market value on August 29, 2021 of

---

[120] *Id.* at art. 13(3).
[121] *Sunglory*, 212 F. Supp. 3d at 653 (quoting *DOROTHY J v. City of New York*, 749 F. Supp. 2d 50, 70 (E.D.N.Y. 2010) & citing *In re Mielke*, Civ. A. No. 10-13519,  2013 WL 5913681, at *6 (E.D. Mich. Nov. 1, 2013) (Zatkoff, J.)).
[122] R. Doc. 38 at pp. 2-3.
[123] *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 990 (5th Cir. 1998) (citing authority).
[124] *Id.* (citing authority).

$18,807,500.00.[125]   While the Salvage Plaintiffs claim that they saved an additional 15 unidentified ARTCO barges each worth approximately $817,719.39,[126] the Salvage Plaintiffs failed to carry their burden of identifying the additional salved barges.

28. Turning to the second Salvage Convention factor, the Court finds that the Salvage Plaintiffs presented minimal evidence beyond speculation that, but for their salvage efforts, the 23 ARTCO breakaway barges would have caused damage to the environment.  Article 1(d) of the Salvage Convention defines "damage to the environment" as a "substantial physical damage to human health or to marine life or resources in coastal or inland waters or areas adjacent thereto, caused by pollution, contamination, fire, explosion or similar major accidents."[127]

    a.  Captain Michael Berry, who was qualified by the Court as an expert in towboat and fleet boat navigation safety and operations, without objection by ARTCO, testified that the Salvage Plaintiffs prevented pollution and damage by stopping the breakaway barges from going downriver and potentially causing damage to other facilities and fleets.[128]  While the Court found Capt. Berry credible, Capt. Berry did not testify regarding the specific damage or pollution that may have been prevented through the actions of the Salvage Plaintiffs.  Instead,

---

[125] Trial Testimony of Andrew Minster.  *See*, R. Doc. 36 at p. 9, ¶ 19 – p.17, ¶ 43.
[126] R. Doc. 36 at p. 51, ¶ 40.
[127] R. Doc. 35 at ¶ 82; R. Doc. 36 at p. 53, ¶ 45.
[128] Trial Testimony of Capt. Michael Berry.

he merely testified that a barge breakaway can cause other barge breakaways, which can cause a domino effect, without elaborating on the specific damage that was prevented by the Salvage Plaintiffs.[129]

b. At trial, Capt. Nicholas Currault and Capt. Kenny Billiot, Sr. both testified that Cornerstone chemical facility was located across the Mississippi River from Lower River's facility, and Joseph Meerman testified that breakaway barges can cause problems for any river facility, including the Cornerstone chemical facility.[130] There was no evidence at trial to suggest that any of the breakaway barges would have hit the Cornerstone chemical facility if the Salvage Plaintiffs had not intervened.

c. Capt. Nicholas Currault also testified that Magnolia Fleet is a red flag fleet, meaning that it has the capacity to dock petroleum barges and "dangerous cargo."[131] Capt. Kenny Billiot, Sr. likewise testified that the Magnolia Fleet is usually all chemical barges.[132] While Capt. Kenny Billiot, Sr. testified that there could have been a chemical spill if any of the breakaway barges had ended up in the Magnolia fleet, he also testified that none of the breakaway barges ended up in the Magnolia Fleet.[133]

---

[129] *Id.*
[130] Trial Testimony of Capt. Nicholas Currault, Capt. Kenny Billiot, Sr., and Joseph Meerman.
[131] Trial Testimony of Capt. Nicholas Currault.
[132] Trial Testimony of Capt. Kenny Billiot, Sr.
[133] Trial Testimony of Capt. Kenny Billiot, Sr.

d. The Court finds that the evidence presented by the Salvage Plaintiffs regarding the environmental damage that was allegedly prevented by their salvage operation is too speculative to support a higher salvage award in this case.

29. As to the third factor, the measure of success obtained, the Court finds that the assistance rendered by the Salvage Plaintiffs, in promptly averting the downriver movement, destruction, and sinking of ARTCO's 23 breakaway barges, was highly successful and supports a substantial salvage award.[134] In measuring the success obtained by the salvor, courts analyze what assistance the salvors provided.[135] In *Allseas Mar., S.A. v. M/V Mimosa*, the Fifth Circuit agreed with the Ninth Circuit that, "a successful action should be viewed as an entirety, not on an-act-by-act basis. To dissect a multifaceted-salvage operation and decide how risky and how successful each particular effort was would entail unreasonable speculation by the courts."[136] In measuring the success obtained, courts can consider the benefit third parties obtained from the salvage operation.[137]

a. Here, the Court finds that the Salvage Plaintiffs were highly successful in rendering assistance, considering they were the only individuals willing and/or available to assist with ARTCO's breakaway barges and

---

[134] R. Doc. 36 at p. 56, ¶ 55.
[135] R. Doc. 36 at p. 56, ¶ 56.
[136] 812 F.2d 243, 246 (5th Cir. 1987) (citing *Saint Paul Marine Transportation Corp. v. Cerro Sales Corp.*, 505 F.2d 1115, 1121 (9th Cir. 1974)).
[137] *Allseas Mar., S.A. v. M/V Mimosa*, 812 F.2d 243, 247 (5th Cir. 1987).

they were the only individuals who responded to the breakaway barges.[138]  Indeed, ARTCO did nothing to assist with the breakaway barges until the following day, when its contracted fleet boats arrived to bring the breakaway barges back to ARTCO's fleets.[139]

b.  The Salvage Plaintiffs' trial testimony and the photographic evidence confirm that the Salvage Plaintiffs secured at least 23 barges on the East Bank of the Mississippi River after Hurricane Ida made landfall, where they remained until ARTCO was able to retrieve them.[140]

c.  The Court finds that ARTCO, and the rest of the Mississippi River, benefited greatly from the Salvage Plaintiffs' prompt actions in securing and "beaching" those barges to prevent them from causing further damage to other property.  The trial testimony also highlighted that ARTCO would have been required to invest significant resources to retrieve any sunken barges had the barges not been secured.[141]

30. The fourth factor, the nature and degree of the danger, also weighs in favor of a substantial salvage award because the 23 ARTCO breakaway barges were in imminent danger of complete loss.[142]  The Court has already determined that the danger faced by ARTCO's 23 breakaway barges was sufficient to meet the

---

[138] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman.
[139] R. Doc. 36 at pp. 56-57, ¶ 56; Trial Testimony of Nicholas Currault, Troy Currault, Capt. Sidney Freeman, Capt. Kenny Billiot, Sr., and Capt. Kenny Billiot, Jr.
[140] R. Doc. 36 at p. 57, ¶ 58.
[141] *Id.* at pp. 57-58, ¶ 59; Trial Testimony of Andrew Minster.
[142] *See*, *Margate Shipping Co. v. M/V J.A. Orgeron*, 143 F.3d 976, 984-85 (5th Cir. 1998); *Allseas Mar., S.A. v. M/V Mimosa*, 812 F.2d 243, 247 (5th Cir. 1987); *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 656-58 (E.D. La. 2016).

Salvage Plaintiffs' minimal burden of proving a "marine peril."[143]  The Court further finds that the evidence at trial, namely the trial testimony of Capt. Nicholas Currault, Troy Currault, Capt. Sidney Freeman, Capt. Kenny Billiot, Sr., Capt. Billiot, Jr., and Capt. Willhoft shows that the danger in question was extreme, as one 55-foot towboat, which had already sustained damage after being struck by one of ARTCO's barges,  single-handedly tended to a steady stream of more than 23 barges that broke away from ARTCO's fleet and drifted downstream throughout the night after a hurricane.

31. The fifth factor, the skill and efforts of the salvors in salving the vessels, other property, and life, further support a substantial salvage award.  Capt. Michael Berry, who was qualified as an expert, without objection by ARTCO, in towboat and fleet boat navigation safety and operations, testified that the maneuvers performed by the Salvage Plaintiffs were extraordinary and exhibited a very high level of skill.[144]  Capt. Berry described the Salvage Plaintiffs' efforts, in both pushing the breakaway barges onto the bank of the river and taking the initiative to push those barges onto the bank when others refused to venture out into the weather conditions, as "phenomenal."[145]  Capt. Berry further testified that he agreed with Capt. Kenny Billiot, Jr. that it is harder to catch a barge and push it without a line, as the Salvage Plaintiffs did, because there is less control and greater reliance on the current of the river, which requires

---

[143] *See*, *supra,* Finding of Fact No. 13.
[144] R. Doc. 36 at p. 55, ¶ 52.
[145] Trial Testimony of Capt. Michael Berry.

tow boating skills.[146]   Capt. Berry testified that Capt. Nicholas Currault exhibited courage and great skill as a captain by pushing the breakaway barges during dangerous hurricane conditions while using a boat with only one working generator.  Capt. Berry and Capt. Sidney Freeman both testified that, contrary to ARTCO's suggestion,[147] the 23 breakaway ARTCO barges would not have beached themselves without the aid of the Salvage Plaintiffs.[148]  The Court found Capt. Berry credible and gives his opinions great weight.

    a.  At trial, the Salvage Plaintiffs presented evidence showing that, but for their efforts, the ARTCO breakaway barges would have caused substantial damage to themselves, as well as neighboring vessels and facilities.  By way of example, Capt. Willhoft testified that Crescent Ship Services facility sustained over $10 million in damages when several ARTCO breakaway barges struck Crescent Ship's dock and crew boats on August 29, 2021.[149]   While ARTCO's representative denied that ARTCO paid $10 million in damages to Crescent Ship Services, he confirmed that Crescent Ship Services was damaged by ARTCO's barges and that ARTCO paid them damages.[150]  The evidence at trial also highlighted the damage to the M/V SHELL FUELER, as well as some damage to the M/V SAINT CHARLES, caused by ARTCO's breakaway

---

[146] *Id.*
[147] *See,* Trial Testimony of Brent Beockmann.
[148] Trial Testimony of Capt. Michael Berry and Capt. Sidney Freeman.
[149] Trial Testimony of Capt. Willhoft.
[150] Trial Testimony of Joseph Meerman.

barges.[151]   The Court finds that the skill and efforts of the Salvage Plaintiffs saved ARTCO significant money and saved downriver facilities and vessels from sustaining significant damage.[152]

   b.   The Court finds the fact that the M/V SHELL FUELER single-handedly tended to a steady stream of breakaway barges flowing downriver from an abandoned 513-barge fleet[153] during a hurricane is an extraordinary display of seamanship and boat handling. The Salvage Plaintiffs promptly devised a method to secure the drifting barges, and the training, education, and experience performing specialty jobs on the Mississippi River provided Capt. Nicholas Currault, Capt. Sidney Freeman, and André Currault with the skills and knowledge needed to successfully perform such a task. Troy Currault's decades of experience likewise helped to direct and support the operation.

32. Turning to the sixth factor, the time used and expenses and losses incurred by the salvors, the Court finds that the Salvage Plaintiffs rescued ARTCO's 23 breakaway barges over the course of approximately 10 hours.[154] The Salvage Plaintiffs testified that the salvage operations were fast moving, as there was a steady stream of breakaway barges during those 10 hours, which forced the Salvage Plaintiffs to be on high alert and utilize all of their resources and focus

---

[151] Trial Testimony of Capt. Nicholas Currault, Troy Currault, and Capt. Sidney Freeman.
[152] R. Doc. 36 at p. 60, ¶ 62.
[153] Trial Testimony of Brent Beockmann and Capt. Sidney Freeman.
[154] Trial Testimony of Capt. Nicholas Currault, Capt. Sidney Freeman, and Troy Currault; Trial Exh. No. 146.

at all times.  While it is evident to the Court that the Salvage Plaintiffs burned extra fuel by using the M/V SHELL FUELER to beach the ARTCO breakaway barges, the Salvage Plaintiffs failed to present any evidence at trial regarding the amount of fuel burned or the out-of-pocket expenses incurred as a result of their salvage efforts.  The only evidence before the Court is that one of the generators on the M/V SHELL FUELER stopped working,[155] and a refrigerator that was mounted to the wall in the galley of the M/V SHELL FUELER broke away from the wall and fell to the floor after the vessel was hit by one of ARTCO's breakaway barges.[156]  The Salvage Plaintiffs, however, did not present any evidence indicating the cost of replacing the refrigerator.  Capt. Nicholas Currault testified that he did not include the replacement cost for the generator in his prior property damage claim because he was able to fix it by changing the regulator, which cost $40.[157]

33. The seventh factor, the risk of liability and other risks run by the salvors or their equipment, the Court finds that the Salvage Plaintiffs incurred an extremely high risk in preventing the downriver movement and sinking of ARTCO's breakaway barges, both as to the loss of their towing vessel, the M/V SHELL FUELER, and their lives.  Capt. Nicholas Currault and Capt. Sidney Freeman testified that it was incredibly dangerous to be aboard the M/V SHELL FUELER when the ARTCO breakaway barges started floating

---

[155] Trial Testimony of Capt. Nicholas Currault, Capt. Sidney Freeman, and Troy Currault.
[156] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman.
[157] Trial Testimony of Capt. Nicholas Currault.

downriver because there was no one else out there to help if something went wrong, and there was no warning when additional breakaway barges approached.[158]  In fact, Capt. Kenny Billiot, Sr. testified that he received a call for help regarding ARTCO's breakaway barges on the night of August 29, 2021, and that he refused to provide assistance until daybreak because he did not want to put his crew in danger.[159]  Capt. Kenny Billiot, Sr. further testified that he would have helped with the ARTCO breakaway barges if he thought that he could do so without endangering his crew or his vessels.[160]  Capt. Kenny Billiot, Jr. similarly testified that he heard someone on the radio call for help with an ARTCO breakaway barge, but that he did not take any action to locate the person requesting assistance or leave the Wood Towing wash dock until the next morning due to safety concerns.[161]

 a. Capt. Nicholas Currault and Capt. Sidney Freeman testified that the first ARTCO breakaway barge collided with the M/V SHELL FUELER around 10 p.m. on August 29, 2021.[162]  The Salvage Plaintiffs testified that their salvage efforts began almost immediately after the collision, when Capt. Nicholas Currault saw more ARTCO breakaway barges floating downriver in his direction, including one that struck the M/V SAINT CHARLES where Troy Currault was stationed.  Capt. Nicholas

---

[158] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman.
[159] Trial Testimony of Capt. Kenny Billiot, Sr.
[160] *Id*.
[161] Trial Testimony of Capt. Kenny Billiot, Jr.
[162] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman.

Currault testified that at around midnight on August 29, 2021, when he was beaching the breakaway barges, there were 50 mile per hour winds with up to 60 mile per hour gusts.[163]  Capt. Willhoft testified that when he saw Capt. Nicholas Currault catch and beach two barges at around two or three in the morning, the wind was blowing pretty hard, and he estimated that it was in the 40 to 50 mile per hour range.[164]  Capt. Willhoft described the weather conditions as "hectic" for a towboat captain moving barges in the Mississippi River, and said that the wind speeds made it a dangerous situation.[165]

b.  As to the risk posed to the M/V SHELL FUELER, Capt. Nicholas Currault testified that Lower River, which he co-owns with Troy Currault, acquired the M/V SHELL FUELER in 2020.[166]  While Troy Currault testified that the M/V SHELL FUELER is the primary asset of Lower River,[167] the Salvage Plaintiffs did not present any evidence to support that statement, to show that the M/V SHELL FUELER was Lower River's only asset, or to show that Lower River would go out of business without it.  Nonetheless, it is clear from the evidence presented at trial that the Salvage Plaintiffs put the M/V SHELL FUELER at risk by using it to beach the ARTCO breakaway barges when it only had one

---

[163] Trial Testimony of Capt. Nicholas Currault.
[164] Trial Testimony of Capt. Willhoft.
[165] Trial Testimony of Capt. Willhoft.
[166] Trial Testimony of Capt. Nicholas Currault.
[167] Trial Testimony of Troy Currault.

working generator and no one else was willing to render assistance with the breakaway barges that night, including to the M/V SHELL FUELER if it had experienced any trouble.

c.  The Court finds that by voluntarily undertaking the salvage operation under these conditions, the Salvage Plaintiffs endangered themselves and their vessel, and exposed themselves to potential liability if they were unsuccessful, all of which supports a substantial salvage award.

34. As to the eighth factor, the promptness of the services rendered, the Salvage Plaintiffs all testified that Capt. Nicholas Currault reacted quickly to the ARTCO breakaway barges flowing downriver.[168]  Capt. Nicholas Currault and Capt. Sidney Freeman testified that the first ARTCO breakaway barge collided with the M/V SHELL FUELER around 10 p.m. on August 29, 2021, and that additional breakaway barges continued to float downriver towards the M/V SHELL FUELER and the Lower River facility for several hours.[169]  Capt. Nicholas Currault further testified that he immediately began using the wheel wash of the M/V SHELL FUELER to push the ARTCO breakaway barges away from the towboat, and then he began to beach the ARTCO breakaway barges as they floated downriver.[170]  Capt. Nicholas Currault testified that he continued to beach additional ARTCO breakaway barges for the next several

---

[168] *See*, Trial Testimony of Capt. Nicholas Currault, Troy Currault, Capt. Sidney Freeman; Trial Exhibit 146.
[169] Trial Testimony of Capt. Nicholas Currault and Capt. Sidney Freeman.  *See*, Trial Exhibit 146 at p. 11.
[170] Trial Testimony of Capt. Nicholas Currault.

hours, from around midnight on August 29, 2021 until around 6 a.m. the next day.[171] Capt. Nicholas Currault's testimony is supported by the trial testimony of Troy Currault and Capt. Sidney Freeman, and by the deposition testimony of André Currault.[172] Further, Randall Brent Beockmann ("Brent Beockmann"), the general manager of operations at ARTCO, testified that ARTCO did not advise any of its neighboring fleet facilities of its hurricane plan, which involved sending its vessels and employees home during a storm, leaving over 500 barges unattended.[173] Thus, when the Salvage Plaintiffs began their salvage efforts, they were unaware of how many ARTCO breakaway barges could be floating downriver towards them. The Court finds that the Salvage Plaintiffs acted promptly to provide salvage services on their own accord, without being asked to do so by the Coast Guard or ARTCO, and despite two of their vessels having been struck by breakaway ARTCO barges.

35. Regarding the ninth Salvage Convention factor, the availability and use of vessels or other equipment intended for salvage operations, the Court finds that the M/V SHELL FUELER was the only vessel in the area with a crew willing or able to stop the downriver movement and sinking of ARTCO's breakaway barges.[174] Joseph Meerman testified that ARTCO sent all of its wheelmen home before Hurricane Ida hit.[175] Brent Beockmann similarly

---

[171] *Id.*.
[172] Trial Testimony of Troy Currault and Capt. Sidney Freeman; Trial Exhibit 146.
[173] Trial Testimony of Brent Beockmann.
[174] Trial Testimony of Capt. Nicholas Currault, Capt. Sidney Freeman, Troy Currault, Capt. Kenny Billiot, Sr., Capt. Kenny Billiot, Jr., and Brent Beockmann.
[175] Trial Testimony of Joseph Meerman.

testified that, as part of its hurricane plan, ARTCO sent all of its vessels home before the storm, leaving almost 500 barges in its fleet by themselves.[176]  While Beockmann testified that ARTCO submitted its hurricane plan to the Coast Guard, Beockmann ultimately admitted that he had not produced a single document in this litigation showing that ARTCO's hurricane plan was ever approved by the Coast Guard.[177]  Additionally, Captain Kenny Billiot, Sr., Captain Kenny Billiot, Jr., Brent Beockmann, and Joseph Meerman all testified that ARTCO's contracted fleet boats were unwilling to provide any assistance to the ARTCO breakaway barges until the morning after Hurricane Ida hit due to safety concerns for their crew and vessels.[178]  Finally, Capt. Nicholas Currault and Troy Currault have extensive experience providing salvage services to the industry.[179]  Capt. Nicholas Currault testified that Lower River used the M/V SHELL FUELER to push barges and perform maritime work.[180]  The trial evidence further supports that the Salvage Plaintiffs' vessel, manned with a captain with the skills and knowledge necessary to respond to this event, was the only vessel in the area that was willing and able to assist with ARTCO's breakaway barges. .

36. Turning to the tenth and final factor, the state of readiness and efficiency of the salvor's equipment and the value thereof, the Court finds that the Salvage

---

[176] Trial Testimony of Brent Beockmann.
[177] *Id.*
[178] Trial Testimony of Capt. Kenny Billiot, Sr., Kenny Billiot, Jr., Brent Beockmann, and Joseph Meerman.
[179] Trial Testimony of Capt. Nicholas Currault and Troy Currault.
[180] Trial Testimony of Capt. Nicholas Currault.

Plaintiffs' equipment, including the M/V SHELL FUELER, its navigational equipment, mooring rope, and fuel, were in a state of readiness and efficiency that enabled the Salvage Plaintiffs to quickly begin rescuing ARTCO's breakaway barges from continuing downriver and either sinking or causing property damage.  Based upon the trial testimony, the M/V SHELL FUELER was the only vessel ready to assist ARTCO's breakaway barges and promptly did so.[181]  Andrew Minster testified at trial that the fair market value of the M/V SHELL FUELER on August 29, 2021 was $500,000.[182]

**D. Weighing the Factors**

37. The Salvage Convention provides little guidance regarding how the Court is to weigh the ten factors, stating only that, "The reward shall be fixed with a view to encouraging salvage operations, taking into account the [ten factors] without regard to the order in which they are presented . . . ."[183]  The clearest guidance offered by the Salvage Convention is that, "The rewards, exclusive of any interest and recoverable legal costs that may be payable thereon, shall not exceed the salved value of the vessel and other property."[184]  In this case, the value of the salved property is $18,807,500.00.

38. As previously mentioned, the parties have agreed that if the Salvage Plaintiffs are unable to prove at trial that they helped prevent or minimize damage to

---

[181] Trial Testimony of Capt. Nicholas Currault, Troy Currault, Capt. Sidney Freeman, Capt. Kenny Billiot, Sr., Capt. Kenny Billiot, Jr., Joseph Meerman.
[182] Trial Testimony of Andrew Minster.
[183] Salvage Convention, art. 13(1).
[184] Salvage Convention, art. 13(3).

the environment, as required under the Salvage Convention, the outcome of the case will be the same as if general maritime law had applied.[185]

39. Because the Court has determined that the Salvage Plaintiffs failed to prove that they helped minimize damage to the environment, the Court finds that general maritime principles apply to determine the appropriate salvage amount to be awarded to the Salvage Plaintiffs.

40. In applying such maritime principles in the context of a salvage award, the Fifth Circuit has held that, "Because of the fact-specific nature of the calculation of a salvage award, 'the amount allowed is to be decided by the district court in its sound discretion.'"[186] Further, as the Supreme Court noted, "[c]ompensation as salvage is . . . viewed by the admiralty courts . . . as a reward given for perilous services, voluntarily rendered, and *as an inducement to seamen and others to embark in such undertakings to save life and property*."[187]

41. In *Margate Shipping Co. v. M/V JA Orgeron,* the most recent Fifth Circuit case to consider a salvage claim, the Fifth Circuit held that, "In order properly to induce the salvor (and salvee) to act . . . the law must provide for a proper and reasonable salvage award, one that gives neither the salvor too little incentive to do the salvage properly, nor the salvee too little reason to care if his property is saved."[188] The Fifth Circuit explained that, "By definition, this 'efficient' fee

---

[185] R. Doc. 38 at pp. 2-3.

[186] *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 983 (5th Cir. 1998) (quoting *Allseas Maritime, S.A. v. M/V Mimosa*, 812 F.2d 243, 246 (5th Cir. 1987)) (internal quotation marks omitted).

[187] *Margate*, 143 F.3d at 986 (quoting *The Blackwall*, 77 U.S. 1, 14, 19 L.Ed. 870 (1869)) (emphasis added by *Margate*).

[188] *Margate*, 143 F.3d at 986 (citation omitted).

is the one that would have been reached by the parties through voluntary negotiation in an open and competitive market, and its value will depend on a number of factual considerations."[189]  The Fifth Circuit in *Margate* held that, "By far the most important of these considerations, however, will be the cost to potential salvors of performing the service and the benefit to the salvee of it being performed," since "no voluntary salvor would be willing to perform a salvage for less than it would cost him to do it, just as no salvee would agree to pay more for a salvage than the loss he could thereby avoid."[190]  The Fifth Circuit further held that, "the *Blackwall* factors represent an explicit guide for the court to use in measuring these two most significant considerations for voluntary negotiation in the salvage context."[191]  The Fifth Circuit in *Margate* expressly held that the value of the salved property is "the principal measure of the benefit of the salvage to the salvee," and, as a result, "is clearly one of the most important of the *Blackwall* factors and must be accorded substantial deference in the calculation of any award."[192]  The Fifth Circuit reiterates this point several times in the opinion, further emphasizing the importance of the value of the salved property when weighing the *Blackwall* factors.[193]

---

[189] *Id.*

[190] *Id.* at 986-87(citation omitted).

[191] *Id.* at 987 (citations omitted).

[192] *Id.*

[193] *Id.* at 989 ("Furthermore, and as we just stated above, our analysis of the economic foundations of the *Blackwall* rule indicates that the value of the salved property is one of the most important of the factors."); *Id.* at 990 ("Furthermore, as the often critical measure of the arm's-length salvage price that the *Blackwall* rule attempts to ascertain, it is clear that value of the salved property is one of the most important of the factors, and the one that truly cannot be ignored.").

42. The Court finds that the facts of this case are similar to those in *Margate*, and warrant a substantial salvage award.[194]  In *Margate*, the district court found that the salved property – a barge carrying an external fuel tank for a NASA space shuttle – was in imminent danger of complete loss, the salved property was valued at $53.3 million, the salvors incurred extremely high risk  as to the loss of their ship and lives, and as to the creation of substantial environmental liability in the event of an oil spill, the salvors displayed extremely high promptitude, skill, and energy in rescuing the salved property under very difficult conditions, the salving property was valued at $7.5 million, and the salvors expended two and one-third days of labor in rendering the salvage service.[195]  As recounted by the Fifth Circuit, "the district court determined that each factor indicated the highest possible award, and it chose 12.5% of the salved value [$6.4 million], as an appropriate figure."[196]  On appeal, the Fifth Circuit was quick to point out that, "This appeal arises from the grant of what appears be the largest maritime salvage award in recorded history."[197]  The Fifth Circuit determined that the district court clearly erred in its determination of the value of the salved property, which the court reduced to

---

[194] The Court recognizes that at least two district courts, including this one, have addressed salvage claims post-*Margate*, but the Court finds those cases distinguishable because the value of the salved property in those cases, which the Fifth Circuit has held is the most important factor, was significantly lower than the value of ARTCO's 23 breakaway barges.  *See*, *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 654 (E.D. La. 2016) (value of salved property was $2 million); *U.S. v. Ex-USS CABOT/DEDALO*, 179 F. Supp. 2d 697, 712 (S.D. Tex. 2000) (value of salved property was $185,000.00).
[195] *Margate*, 143 F.3d at 984-85.
[196] *Id*. at 985.
[197] *Id*. at 979-80.

$31 million.[198]  Applying the district court's 12.5% salvage percentage to that value, the Fifth Circuit calculated a modified salvage award of $4.125 million.[199]  The Fifth Circuit then "compiled a list of the nine largest federal salvage awards in comparable high-value, high-order cases since the advent of the *Blackwall* rule," and, after adjusting the amounts to 1994 dollars on the basis of the relevant U.S. Consumer Price Index deflator, determined that the reduced $4.125 million/12.5% award "is not so excessive as to constitute an abuse of discretion in the context of this case."[200]  The Fifth Circuit further observed that, "The range of percentages appears to run from about 4% to 25%, and the percentage here is smack in the middle of that range."[201]  The Fifth Circuit commented, however, that, "as the district court noted, it is rare that a salvage action would involve such high ratings on each of the factors as was the case here."[202]

43. Here, the Court has found that a majority of the Salvage Convention factors weigh in favor of a substantial award, reaching the following conclusions as to the ten Salvage Convention factors:

> 1. the salved value of the 23 ARTCO breakaway barges on August 29, 2021 was $18,807,500.00;
> 2. the Salvage Plaintiffs failed to show that their actions prevented or minimized damage to the environment;
> 3. the Salvage Plaintiffs achieved a high level of success in preventing the downriver movement, destruction, and sinking of ARTCO's 23 breakaway barges;

---

[198] *Id.* at 990-93.
[199] *Id.*
[200] *Id.* at 993-95.
[201] *Id.* at 995.
[202] *Id.*

4. the 23 breakaway barges were in imminent danger of complete loss;

5. the Salvage Plaintiffs demonstrated a high level of skill and effort in salving the 23 breakaway barges and preventing damage to other property;

6. the Salvage Plaintiffs expended approximately 10 hours in rendering the salvage service, but failed to present sufficient evidence to show the expenses and losses incurred in undertaking the salvage operation;

7. the Salvage Plaintiffs incurred a high risk in saving the 23 ARTCO breakaway barges, both as to the loss of their vessel, the M/V SHELL FUELER, and their lives;

8. the Salvage Plaintiffs displayed extremely high promptitude and energy in rescuing the 23 breakaway barges by virtue of their daring and successful seamanship under difficult conditions;

9. the M/V SHELL FUELER, which was typically used to push barges and for other maritime work, was the only vessel in the area with a crew willing and able to stop the downriver movement and sinking of ARTCO's breakaway barges; and

10. the Salvage Plaintiffs' equipment, including the M/V SHELL FUELER, was ready to assist the ARTCO breakaway barges, and the fair market value of the M/V SHELL FUELER on August 29, 2021 was $500,000.00.

44. Thus, the Court finds that seven of the ten Salvage Convention factors weigh in favor of a substantial salvage award, with the second, sixth, and tenth factors weighing against a substantial award.

45. As previously mentioned, "At least two district courts that have considered salvage claims pursuant to the Salvage Convention have concluded that the 'six *Blackwall* factors were essentially adopted, although not in identical language, by the 1989 Salvage Convention.'"[203]

46. Unlike in *Margate*, where the district court found that all six of the *Blackwall* factors supported "the highest possible award,"[204] this Court finds that two of

---

[203] *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 653 (E.D. La. 2016) (quoting *DOROTHY J v. City of New York*, 749 F. Supp. 2d 50, 70 (E.D.N.Y. 2010) & citing *In re Mielke*, Civ. A. No. 10-13519, 2013 WL 5913681, at *6 (E.D. Mich. Nov. 1, 2013) (Zatkoff, J.)).
[204] *Margate*, 143 F.3d at 985.

the *Blackwall* factors – the labor expended by the salvors in rendering the salvage service (factor #1) and the value of the property used by the salvors in rendering the service (factor #3) in this case – do not support a high salvage award.  In *Margate*, the district court found that the value of the property used by the salvors was $7.5 million, and that the salvors expended two and one-third days of labor in rendering the salvage service.[205]  Here, the M/V SHELL FUELER is valued at $500,000.00 and the Salvage Plaintiffs expended only approximately 10 hours of labor in rendering salvage service.  Additionally, the Fifth Circuit in *Margate* held that the district court did not err by considering the risk of environmental liability incurred by the salvors under the fourth *Blackwall* factor.[206]  Here, the Salvage Plaintiffs failed to present sufficient evidence regarding the risk of environmental liability that they incurred.

47. Based upon the foregoing distinctions, the Court finds it appropriate to award a substantial salvage award to the Salvage Plaintiffs, but in an amount less than that awarded in *Margate*.  The Court recognizes that the *Margate* court's salvage award of $4.125 million in 1998 has the equivalent value of approximately $6.9 million in 2021, the year that the salvage operation occurred in this matter.[207]

---

[205] *Id*.

[206] *Id*. at 985 & 988-89.

[207] *See*, U.S. Inflation Calculator, https://perma.cc/4MLT-6JLL ($6,857,369.63); Bureau of Labor Statistics, CPI Inflation Calculator, https://perma.cc/SK9M-LHSX ($6,923,091.26).

48. The Salvage Plaintiffs seek an award of $9,400,000.00, which is approximately 50% of the value of the salved property.[208]  The Court agrees with ARTCO that an award of $9.4 million would be the largest award in salvage history, and further finds that such an award would constitute a windfall to the Salvage Plaintiffs and is not warranted under the facts of this case in light of the Court's above analysis.[209]  As recognized by another Section of this Court, "It is certainly the policy of the maritime law to grant salvage awards that will encourage seamen to incur risk in going to the aid of vessels in distress; but it was never the policy of the law to allow a situation created by calamity to be converted into a windfall of unreasonable extravagance."[210]  Moreover, the Fifth Circuit has cautioned that, when setting the percentage applicable to the fifth *Blackwall* factor (the value of the saved property), "some care should of course be taken to stay within the bounds of historical practice, . . . and to account for all of the relevant circumstances of the specific salvage at issue."[211]  Further, "The predominant consideration, however, should always be to arrive at an award that reasonably reflects the price upon which the parties would have agreed."[212]

49. Weighing all of the Salvage Convention factors, and guided by considerations of equity as well as the policy considerations of salvage awards, the Court

---

[208] R. Doc. 36 at ¶ 95.

[209] R. Doc. 35 at p. 31, ¶ 94.

[210] *Sunglory Maritime, Ltd. v. PHI, Inc.*, 212 F. Supp. 3d 618, 666 (E.D. La. Sept. 9, 2016) (quoting *Sobonis v. Steam Tanker Nat'l Def.*, 298 F. Supp. 631, 640 (S.D.N.Y. 1969)) (internal quotation marks omitted).

[211] *Sunglory*, 212 F. Supp. 3d at 652 (*citing Margate,* 143 F.3d at 989).

[212] *Margate Shipping Co. v. M/V JA Orgeron,* 143 F.3d 976, 989 (5th Cir. 1998).

concludes that a salvage award of $3,761,500.00, or 20% of the fair market value of ARTCO's 23 breakaway barges, is appropriate in this matter.

**E. Pre-Judgment Interest**

50. The Salvage Convention provides that, "The right of the salvor to interest on any payment due under this Convention shall be determined according to the law of the [country] in which the tribunal seized of the case is situated."[213]

51. "In the United States, it is generally accepted that 'under the maritime law, the award of prejudgment interest is 'well-nigh automatic.' Furthermore, admiralty courts have discretion in setting the rate of prejudgment interest."[214]

52. "As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled."[215]

53. "[I]n maritime cases the award of prejudgment interest is the rule, rather than the exception, and the trial court has discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable."[216]

54. The Fifth Circuit has held that, "Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable

---

[213] Salvage Convention, art. 24.
[214] *Sunglory*, 212 F. Supp. 3d at 674 (quoting *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 214-15 (5th Cir. 2006) & citing *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture, in a Cause of Salvage, Civil & Mar.*, 695 F.2d 893, 907 (5th Cir. 1983)).
[215] *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 580 (5th Cir. 2015) (quoting *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. Unit A 1980)) (internal quotation marks omitted).
[216] *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 205 (5th Cir. 1995) (citing *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986)).

doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by the plaintiff."[217]

55. "[I]n this Circuit, prejudgment interest is ordinarily awarded from the date of loss."[218]

56. The Court finds that no peculiar circumstances exist to deny an award of prejudgment interest. While the salvage amount awarded by the Court is less than the amount claimed by the Salvage Plaintiffs, the amount awarded was determined by equity, historical considerations, and policy considerations of salvage awards. There was no evidence introduced that the Salvage Plaintiffs either fabricated or exaggerated the amount they claimed. The Court's finding in this respect is similar to the finding by the court in *Sunglory Maritime, Ltd. v. PHI, Inc.* that, "the damages ultimately awarded are substantially less than those claimed by Plaintiffs, which weighs against an award of prejudgment interest, but this was not a case of two parties with 'good faith claims [who] both have been found to be at fault,' which therefore weighs in favor of allowing prejudgment interest."[219] While ARTCO contends that, "there is cause to question whether the salvage claim was brought in good faith,"[220] it fails to provide any support whatsoever for that statement, and the Court has found none.

---

[217] *Reeled Tubing, Inc.*, 794 F.2d at 1028 (citing authority).
[218] *Id.* (citing authority).
[219] 212 F. Supp. 3d 618, 675 (E.D. La. 2016) (quoting *St. James Stevedoring Partners, LLC v. Motion Navigation Ltd.*, Civ. A. No. 13-541, 2014 WL 3892178, at *19 (E.D. La. Aug. 6, 2014) (Lemon, J.)).
[220] R. Doc. 35 at ¶ 101.

57. The Court will exercise its discretion and award prejudgment interest to the Salvage Plaintiffs from the date of judicial demand of the salvage claim rather than the date of loss.  The Court makes this determination recognizing the competing factors set forth above.  While recognizing the Salvage Plaintiffs' delay in filing the salvage claim, the Court further recognizes that the late filing only minimally delayed the proceedings and the matter was brought to trial less than one year after the lawsuit was filed by Salvage Plaintiffs.[221] Further, the Court has not found any evidence that the Salvage Plaintiffs "improperly delayed resolution of the action."[222]

58. The Court further recognizes the trial testimony that three of the salvage plaintiffs – Troy Currault, Capt. Nicholas Currault, and André Currault – run a family-owned business (salvage plaintiff, Lower River), and finds that they are entitled to be compensated for the use of funds to which the Salvage Plaintiffs were entitled, but which ARTCO had use of prior to judgment.[223]

59. Accordingly, the Court awards the Salvage Plaintiffs prejudgment interest at a rate of 5%, which is consistent with the rate for post-judgment interest set by the Federal Reserve Board pursuant to 28 U.S.C. § 1961.  Prejudgment

---

[221] As noted in the Introduction, the litigation began in August 2022 when Crescent Ship Service, Inc., its insurers, and Lower River Ship Service, LLC filed three separate lawsuits for property damage allegedly caused by barges that broke away from ARTCO's fleet during the hurricane.  In July 2023, the Salvage Plaintiffs filed its Verified Marine Salvage Complaint against ARTCO, seeking a marine salvage award, and the case proceeded to trial in April 2024.  *See*, R. Doc. 1.

[222] *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.,* 792 F.3d 564, 580 (5th  Cir. 2015).

[223] *See*, *Reeled Tubing*, 794 F.2d at 1028 ("Prejudgment interest is usually awarded to the date of loss to ensure that the injured plaintiff is compensated for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to judgment.") (citation omitted).

interest shall begin from the date of judicial demand made by the Salvage Plaintiffs.

## IV.    CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that the Salvage Plaintiffs, Capt. Nicholas Currault, André Currault, Troy Currault, Lower River Ship Service, LLC, and Capt. Sidney Freeman, are entitled to a salvage award in the amount of $3,761,500.00, and further that that Salvage Plaintiffs are entitled to prejudgment interest at a rate of 5% from the date of judicial demand made by the Salvage Plaintiffs.

**IT IS HEREBY ORDERED** that there be judgment in favor of Salvage Plaintiffs, Capt. Nicholas Currault, André Currault, Troy Currault, Lower River Ship Service, LLC, and Capt. Sidney Freeman, and against defendant, American River Transportation Company, LLC, on Salvage Plaintiffs' claim for a salvage award in the amount of $3,761,500.00.

**IT IS FURTHER ORDERED** that Plaintiffs are entitled to prejudgment interest on their award in the amount of 5% from the date of judicial demand by the Salvage Plaintiffs.

**IT IS FURTHER ORDERED** that the Salvage Plaintiffs shall have **ten (10) business days** from the date of these Findings of Fact and Conclusions of Law to provide the Court with a proposed Final Judgment that is commensurate with the Court's Findings of Fact and Conclusions of Law.  The Salvage Plaintiffs shall send

the proposed Final Judgment to the Court's email address, efile-Vitter@laed.uscourts.gov.

New Orleans, Louisiana, June 14, 2024.

**WENDY B. VITTER**
**United States District Judge**